Town versus CS, number 19-270. Thank you. Thank you, Your Honor. May it please the Court, my name is Mark Rushfield, and I'm representing the Appellant School District in this matter. I'd like to begin, if I may, by focusing on just a few of the key facts, because the facts I think are not really in dispute in this case, but a few of them are just key to, I think, where this Court goes in this matter. The students involved in this case had been a student at Eagle Hill for the 2015-2016 school year after rejecting an IEP that provided for a 12-1 plus 1 ratio special education class. This is a June 9, 2016, CSC meeting. It's undisputed that at that meeting, an IEP is formulated which provides for a 15-1 plus 1 class for the student entering the middle school. It's attended by the parent. The parent acknowledges that that's what was discussed at that meeting and agreed to at that meeting. Later that month, the parent actually attends the middle school to see the program. Sorry, you say it was agreed to at that meeting. That was the school's position. It was going to be 15-1-1. But the parents were advocating for something smaller, right? Oh, yes, most definitely. But it's not uncommon that an IEP is formulated and that a parent objects to its conclusion. That's how we get to places like that. I understand, but I wanted to clarify. So later in June of 2016, it's confirmed to the parent by teachers at the school that it's a 15-1 class. Before the parents even received the IEP, and I think this is really a key fact in this case, before the parents receive an IEP, on August 17, 2016, the parents issue a letter, a notice to the district, telling them that they're rejecting the IEP that was formulated at the meeting on June 9, and that they're going to be Wait a second. You said before the parents received the IEP, they sent a letter rejecting the IEP. Yes. Yes. They had not received the written IEP. There was a discussion. They knew what it was. Yes. Why should they delay? If it's not satisfactory, why shouldn't they say so? I don't know why they delayed. The record doesn't tell us. No, they didn't delay. You said that before they received the written one, they rejected the one that had been discussed. Well, that's true. August 17, 2016, they reject the IEP that was discussed on June 9. All right. Wasn't part of the letter, their August letter, to inform the school that they still had not received the written IEP? They did say so. That's right. And why was that? I mean, they didn't get it until the very end of August. The record doesn't disclose for us, and so I don't know why the IEP they get, which is incorrect, is as near as at the end of the month. Do they have a right to get the written IEP before the school year starts? Because the parents have to make a decision based on what the IEP actually says, right? Well, the parents have to make a decision based upon the program that's been formulated. The IEP lays out in writing what the program is that was formulated. But in this case, the parents knew what the IEP was supposed to say. Well, they've been told that. That's how they came. I'm sorry. That's how they came to reject it. I'm sorry. Yes, they've been told that. But then when they receive it and it says 12-1-1 in several different places, they were confused and they had to make a decision, didn't they? No, I don't believe. Well, they have to make a decision, obviously, but I don't believe they're confused. You agree, though, that it's a little difficult to know from the outside, but you agree that the written IEP that they got said that math, English, and the other classes would be in a 12-1-1 situation, right? That's correct. And the parents had to make a decision based on that. Parents had made a decision, Your Honor, on August 17, 2016, based upon being told that it was a 15-colon 1-plus-1 class. That's really undisputed in the record. I understand that the IEP — we all know the IEP comes — They were told verbally? That's what happens at the CSE meeting. It's established what the plan's going to be. The parent objects. Then what's the purpose of the writing? The purpose of the writing is so that people don't end up here arguing back and forth over what was said. My notes say this. Your notes say that. You need something in writing so parents can make a decision. Enrolling a kid in a private school is a very expensive proposition. They need to know categorically what the offer is from the school so they can know whether to put down the down payment. I think the parents — I would agree the parents do need to know, but the parents here did know. The IHO, who heard all the testimony, states, essentially, that the parents knew what the program was, that it was a 15-colon 1-plus-1 program. We might dispute — that might be disputed about exactly what was known at what time, because although they may have been told something, as Judge Jacobs is pointing out, the act revolves around having a written plan that sets out what the school is offering and what is proposed. That plan, when it was ultimately delivered, said 12-1-1. The plan that was ultimately delivered obviously did say 12-1-1. I just wish to reiterate that the plan they were rejecting was a 15-colon 1-plus-1, and I think that is not disputed. I understand that the writing — that's why we're here — but the writing that was issued later has an error. It's a good-faith error, but it's an error. And that's where we get to the issue of whether that error can be corrected during a resolution period. Can I ask you a question? Suppose the parents had said, fine, 12 is good, we agree. Would the school board have provided it? No. It would not have provided it, but that's also a matter of the record. Such a class did not exist. But the parent knew that class did not exist. This all went through an impartial hearing in which findings based upon the testimony of the parent, issues. And those findings are entitled to deference because they're not challenged by anyone, but not challenged by the SRO. Could you go on to what happened in October and what the school board's position is with regard to its right in the resolution period to alter the written IEP without the parent's consent? Well, I think there are two factors. One is based on what this Court said in R.E. Even the — a good-faith error can be corrected through an amendment by — at the resolution session, even though the parent can then still proceed with a — their due process complaint, which they issue earlier. And you would say that could happen at any time? Because due process complaint doesn't have to be filed for two years, right, after — right? It could happen at any time, and — So that means what you're saying is that if these parents had waited two years to file their due process complaint, they had to hire a lawyer, they had to deal with schooling and so on, and there had then been triggered a 30-day resolution period, that the school at that point would have been free to alter the IEP to provide 15 plus 1 plus 1. Is that right? Well, an IEP team can alter without consent at any time. The question, I think, becomes whether the — this action constitutes a procedural violation, and if so, whether that procedural violation has denied the student a free, appropriate public education by, for example, denying the parent the right to participate fully in the IEP formulation. But aren't you taking the position that the school, during the resolution period, based on R.E., the dicta and R.E., that the school is free — school district is free to alter the plan even two years after the school year is over. Is that correct? I think that both under R.E. and both under 20 U.S.C. 1414 D3F, if it's a full IEP team, the plan can be amended. So the parents would have had to make a decision about their child's schooling two years prior, given the 10-day notice period, but if they can't afford, for example, to bring suit and file a due process complaint until two years after, that the school is then free to revise the IEP relevant to a period two years earlier, and then the entitlement to tuition would be based on the new amended plan. Is that right? The entitlement to tuition to those circumstances that you just described would be based on whether this procedural violation denied the parent the ability to fully participate in the formulation of the IEP and the other standards for procedural violations established by this court. And I think that that's why this case is very fact-sensitive, because normally you're not going to have a situation where the parent knows what the plan is ahead of time. Normally you're not going to have a situation like this, where the parent, basically as we see it, getting an IEP they know is correct, engages in a basic gotcha tactic, and says in their due process complaint, which issues a couple of weeks later, listen, we know you can't do this program because we know what the program is, and therefore you have violated the act. Okay. Why don't we hear from your adversary? You have two minutes for rebuttal. Thank you, Your Honor. Thank you. Thank you, and good morning, Your Honor. I need to bring this up. You can adjust the microphone also, so you're speaking into it. Is this all right? Yes. Okay. Good morning, and may it please the Court. My name is Jason Stern. I'm arguing for the parent, Applee, in this case. Now, I want to clarify a few things about the facts. One, the parent gave 10-day notice because 10-day notice is required. I mean, you know, the parent testified, and it's in the appendix on page 417, that the parent had not really made the decision yet. Now, in Forest Grove, the Supreme Court recognized that the 10-day notice period provides a safe harbor for a school district to make changes to try to keep the child in a public school. And there was a California case that's also – or a Ninth Circuit case that's also cited with respect to that. This is the safe harbor. This is the opportunity. The parent, on August 17, puts in the 10-day notice, has a laundry list of complaints, including that she hadn't gotten the IEP yet. The school district has the opportunity to convene a CSE, to discuss all these issues, to make a new IEP. Could the school district have looked at the IEP, had there been a written one prepared at that time, noticed the error, and corrected it without a problem? Well, absolutely. Absolutely. And in this case, the school district really did nothing during the 10-day period. It was only at the very end of that that they shipped the IEP out to the parent. And the parent could reasonably believe that this was the school district's  timely, if it's timely, if the offer is made at the end of the 10-day period. Well, I think the real — You said it's timely if it's within the 10-day period. Yeah. Yeah. I think — So it's timely if it's at the end of the 10-day period. Well, Judge, I would even go further than that. The parent has the 10 days. The 10 days are binding on the parent. But I think they could probably still make the change any time up to the point that the student actually leaves. So 10 days is the minimum period. Some parents give notice more than 10 days before. But I think realistically, you know, a school district could still, you know, shortly before the school year starts, even if it's outside the 10 days, come back and say, hey, we want to accommodate you, we want to fix this, we want to keep your child in the public school. Didn't they do that and say 15 days? No. They did not. They did not. Fifteen students? When was that statement made? When did they alter the erroneous 12 to the 15 that they intended? That's really unclear in the record. The state review officer reviewed the record, reviewed the testimony of Mr. Rosen, reviewed the documents, and concluded that October 27th was the date. Mr. Rosen, the director — Was the date that? The date that the IEP was changed. That was what the SRO concluded. That the 15 plus 1 plus 1 revised IEP was mailed out on October 27th? Yes. And the SRO took that date to be the date that the IEP was changed, which was outside the 30-day resolution. And the child is already in school? Oh, yeah. The child had been in school since early September. And I should note that at the resolution meeting, there was no effort to resolve the parents' concerns. The parents' concerns were, I've just footed the bill for a very expensive private school, and I want to be reimbursed. What can you do for me? And the school district had no interest in talking about that. As it went down, apparently, Mr. Rosen said, we'll fix the IEP, see you. And I think the SRO probably concluded that the facts were unclear because Mr. Rosen tells a couple of different stories as to the amendment. On page 267 of the appendix, he testifies that he sent out a cover letter IEP prior written notice immediately after the resolution meeting. That's my understanding. That's the reason I asked the question. Right. He testified that. As to whether it went out at the end of the 10-day period. No, no, no. What he testified – there's a meeting. I'm sorry. Can you help me? Yes, I will try. The resolution session was held on October 7th. His original testimony was that immediately after that – and this is on page 267 of the appendix – that he mailed a cover letter, a prior written notice, an IEP to the parent. He came back the following hearing date, and he testified, apparently having consulted with counsel, which he was not supposed to do, which was a little bit of an issue at the start of this hearing date, and he recognizes that the IEP actually wasn't sent to the parent immediately after the resolution meeting, but 20 days later, which is after the resolution period was over. And so he testifies there that he thinks that he changed the IEP, presumably in the computer, somewhere in the middle. He doesn't have a log of this. He doesn't have a specific recollection. He just says, I think it was somewhere in the middle. And the SRO said, this is confusing, this is unclear. So the SRO took the date that actually was on the prior written notice, on the letter, and said, this is the date. And this is consistent with the Ninth Circuit's statement in Union v. Smith, which is a case very similar to RE, where the Ninth Circuit said, relying on the written IEP, written documents, avoids these troublesome factual issues of what the recommendation is, where it's going to be, and when it took place. So the SRO, I think, very correctly said, we rely on the written document to determine when the document was changed. The district says that the parents had rejected 12 or 15. So if that's right, then how were the parents' right to significantly participate in the process impeded? I don't think it's a question of that. It's a question of the issue in an IEP they could not implement. And that's under M.O., that that's a denial of FAPE. So whether or not they could participate, the fact is, if that student goes into that school on day one, that student has an IEP that can't be implemented. So your argument is that because of the timing failures to correct the IEP, that the June 1 was operative, and they couldn't deliver on that? Excuse me. I didn't hear that. So your position is that because of the timing failures by the district, that it was the June IEP that was operative, and the district couldn't deliver on the 12-1-1 program? Right. Yes. Yes. Your adversary is arguing that the parents are sandbagging the district. I think that they knew, because of prior conversations, that the written IEP that they accepted either anyway. And therefore, it should have the benefit of being able to make unilateral changes in the resolution period. Why is that approach wrong? First of all, I don't think there's any authority supporting the idea that a school district can just make unilateral changes during the resolution period. RE does not say anything about unilateral. And the IDEA specifically states that the purpose of the resolution period is to resolve the parents' complaint and to arrive at a written agreement signed by both the school district and the parent. When you say the school board can't make a unilateral change, what if the school board unilaterally offers to do or to create a class, to provide services that fit what the parents want, but the parents really prefer the private school, and therefore say, well, we're not going to agree to it. You tell me. Is the school board able to make that unilateral change? Are the parents in a position to say no, to a yes? The IDEA provides another safe harbor for school districts. No, but look, it's complicated enough. My question is, I think, quite clear. I'm trying to answer it within the context of the IDEA, because there's another provision that gives the school district the opportunity to make an offer of settlement in writing at least 10 days before the start of the hearing. And there are consequences for parents who reject that offer and then don't get more than that at hearing. So the school district could have done that. It's sort of like a cram down in bankruptcy. You can offer it and people have to accept it. Or take the risk. Could I actually ask you to refine that answer, because I wonder about the school district's rights in the period of the 10-day notice period versus in a later resolution period after the filing of a due process complaint. Are they different? Can the school board alter the proposed IEP unilaterally in one and not the other to address the parents' concerns? Under the IDEA and the regulations, for the school district to amend an IEP, it either has to have the consent of the parent or it has to conduct an IEP team meeting. And for the first time on appeal, the school district is now arguing that the October 7th meeting was, in fact, an IEP meeting. I would refer the Court to the record. It's page A309, where Mr. Rosen, who conducted that meeting, expressly testified this was not a CSE meeting. This was a resolution meeting. Were all the people required to be in attendance at such a meeting there? No. Almost none, other than Mr. Rosen and the parent. It wasn't noticed as a CSE meeting, but I think it's very telling that the guy has to be a teacher. Did there have to be general ed, special ed teachers, among other things? But Mr. Rosen himself testified it wasn't a CSE meeting, and counsel is raising this for the first time on appeal. Do we need to reach the question whether the district can unilaterally change the IEP during the 30-day resolution period if it just failed to do so under the timing? It didn't satisfy the 30 days, like you said earlier? Why does it matter? Ending R.E. past the 30 days, and it opens the door that it could be 31 days, 35 days. Are you saying that R.E. does allow the changes? I thought you said that it was dicta. It is dicta, but I will defer to amicus, because amicus is going to handle that argument. Why don't we move on, then, to your amicus? My name is Andrew Feinstein. I'm here representing the Council of Parent Attorneys and Advocates, a national organization of special ed parents, lawyers, advocates, fighting for the rights of students with disabilities. And we're pleased that you allowed us to participate in this hearing. Our fundamental issue is that R.E., the R.E. decision in 2012, is internally contradictory. The major holding of that case is that you're not going to accept retrospective testimony, except if it's to clarify what's in the IEP document. But then there's this language that during the 30-day resolution period, the district can change the IEP, quote, without penalty. That's — those are inconsistent statements. Change without penalty, unless the change without penalty is limited to the clarifying type amendments that are provided earlier in that decision, it takes us to the place which all of you have mentioned. But whether it can or can't, your friend just said it didn't happen within the 30-day period, right? Well, in this case, it did not happen within the 30-day period. Why should we decide that question? Well, I think you should decide that question because there are a number of district courts that have used the without penalty language out of R.E. in order to base decisions on. And I think that language is just inconsistent with the IDEA. But that's not at issue in this case. You can see that. Well, I think it is at issue in this case. I mean, yes, you can decide on the narrow ground that it wasn't done within the 30-day period. Well, isn't it good craft to decide it on the narrow ground rather than reach out to the broader ground? If, as you say, there are other cases in which this is a live issue and affects the outcome, then they'll percolate up here, and I assume another panel will be just as accommodating and listen to you then. And in those, what we have is students who are going through their educational process, and as we wait to clarify the law, which I think is misstated in R.E., as we wait to clarify the law, these students suffer damage, suffer educational damage, which is irreparable. You're not challenging, Chris, the main holding of R.E. Oh, no. I think the main holding of R.E. is perfectly proper. So we're looking at the paragraph that just says without penalty. Without penalty. And it's unclear, really. It's just a paragraph, and it wasn't essential to the decision whether that permitted unilateral changes in the resolution period. It did not take account of the other mechanisms that the statute set up for avoiding the sandbagging specter that your adversary has drawn. That's absolutely correct. A couple of other points to make. One, the law is very clear. The IEP has to be in place before the beginning of the school year. And that was not true in this case. And having the IEP written in place before the beginning of the school year gives the parents the knowledge of what's being offered and lets them assess their risk in placing the child privately. To allow changes after that date puts parents in an impossible situation. Can you give us any idea of how widespread the reliance is in an active way by school districts on the dictum in R.E., as well as kind of the, you know, number of cases percolating right now in the district court? Do you have any idea of the magnitude? This obviously isn't in the record. I do not. I practice in Connecticut, not New York. And this argument has not been raised by school board lawyers to date. It's the Westlaw search, for me, produced, I believe, 11 cases where the without penalty language was quoted, but none of them were really decisive. None of them relied on it for the result of the holding? You said decisive. Yeah. The decisions were made on grounds separate from that. Yes, Your Honor. One of the problems is I'm not sure I understand. It is dictum, and I'm not sure I understand what it says. And if we were to reject it, we would have to say, we'd have to define what it says and means, which is already challenging. I think to the extent that the dictum means that the sort of changes that can be made are clarifying, explanatory, the type of language from the earlier part of R.E., we have no problem with that. You see, in this case, in this case, the board is arguing that the change is explanatory because it simply implements, by changing a number, that which the parents already knew and understood. And, therefore, and, therefore, Right. And that's what takes looking into the record in this case. It does. Wouldn't you say that the 12-1-1 versus 15-1-1, in many circumstances, is like the essence of the plan? And that's right. And R.E. actually has language about how the ratio is a critical decision, whereas other facts, such as parent training in that case, were considered not substantial. And what's important to note is that the change went from a higher level of service to the student to a lower level of service. And let me just hit I'm just guessing that might be accommodation. Well, from 15 to 12 would mean greater 12 provides a greater level of service than 15 does. I think we have the arguments and we have your briefs. Thank you very much, Your Honor. Thank you very much. Mr. Rushfield, you have two minutes of rebuttal. And I'd ask whether you know, from your practice perspective, whether this language in R.E. is being relied on by school boards generally,  or whether we should focus on whether it doesn't present an urgent problem. Your Honor, I can't address the question because I only deal with these when they're already at the court level. I don't deal with them at the SRO level. I don't do SRO hearings or IHO hearings. So I'm probably the wrong person to answer that question. Okay. Thank you. I would just like to first clarify a couple of things, if I may. At page 417 of the appendix, at pages 1289 to 90 of the transcript, the parent made clear that the decision to place the student at Eagle Hill is for the reasons set forth in her August 17, 2016, letter. Again, this is at a time when she knows it's a 15-colon-1-plus-1 ratio. Concerning the issue that I think Amicus was going to be asked to address, which was the issue about the 30 days versus, well, what if it's 31st day under R.E. And I would direct your attention to the Jay Z versus Pollitt decision in this court, which involved another cutoff. It was a 45 days by which an IHO had to render a decision under the Court of Federal Regulations. And this court said that, well, yes, it is 45 days, and that procedural violation occurred here. It didn't make the 45 days. It was, like, 13 days over. But nonetheless, we go to the issue of this is a procedural violation. It's not per se a denial of a free, appropriate public education. We look to did it impact the participation of the ability of the parent to participate? Did it impact upon the student being provided with a free, appropriate public education? Did it impact upon? So you're not disputing now whether that the district failed to amend the IEP in October within the 30 days? I am not. We have not changed our position. I'm just addressing that issue. The fact is that, according to the record, the IHO found that it was corrected at the resolution session on October 7th. But, again, it's not reduced to writing then. The testimony in the record is that in mid-October, under cross-examination, a couple of questions by counsel for the parent, Mr. Rosen testifies it was mid-October that we put it to writing in the system. The problem here is, in terms of R.E., of course, is that the letter goes out a day late. And the point I raise for the parents don't get it until several days after that. So they claim it. I don't think the Court's decision should rely upon when the parent says they received something, because if you want to get into an issue about fact disputes, that goes a long way. But I think what we have here — It seems certainly more relevant than when somebody might have put it into a computer system somewhere. Well, actually, I don't think so, because I think the IEP is developed by then. The issue, I think, is when was the IEP developed? The whole point is to allow the parents to rely on this, on the plan. Well, the parents know. In this case, the parents, like I said, know before they get the incorrect IEP what the plan is. At the resolution session, they know what the correction is, and that's October 7th, by which time the student's been enrolled in the school for about a month, because the student starts September 6th. And if the issue is, and this is what the SRO found the issue was, if the issue is, well, it's the 31st day, and therefore it's a per se violation and we don't go to the issue of what we normally do, what the courts normally do in dealing with procedural violations, then I'm addressing the question about the fact that it was issued a day after the resolution period. And I think J.D. v. Paulette literally addresses that issue. Yes, Your Honor. Thank you very much. I think the red light's been on for a little bit. I'm sorry, Your Honor. That's okay. Thank you very much. We have the arguments.